IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF PENNSYLVANIA


Elmer Parker,

        petitioner

*10-882*

    v.

                         Case No: to be assigned

T.R. Sniezek,

        respondent

FILED
SCRANTON
APR 26 2010
PER _____
DEPUTY CLERK


## MEMORANDUM OF LAW IN SUPPORT OF

## MOTION PURSUANT TO 28 U.S.C. § 2241


    The pro-se petitioner, Elmer Parker, respectfully approaches this most Honorable Court, pursuant to 28 U.S.C. § 2241, whereas, "a writ of habeas corpus under § 2241 is available to a federal prisoner who does not challenge the legality of his sentence by challenges instead its execution subsequent to his conviction. Carmon v. United States Bureau of Prisons, 234 F.3d 269, 632 (2nd Cir. 2001).

    A habeas corpus petition is the proper mechanism for a prisoner to challenge the "fact or duration" of his confinement. Preiser v. Rodriquez, 411 U.S. 475, 498-499, 36 L. Ed. 2d 439, 93 S. Ct. 1827 (1973).

(2)

## STATEMENT OF JURISDICTION

Under 28 U.S.C. § 2241(c), habeas jurisdiction "shall not extend to a prisoner unless...he is in custody in violation of the constitution or laws or treaties of the United States." 28 U.S.C. § 2241(c)(3). A federal court has subject matter jurisdiction under § 2241(c)(3) if two requirements are satisfied:

(1) the petitioner is "in custody"

(2) the custody is "in violation of the constitution or laws or treaties of the United States".

28 U.S.C. § 2241(c)(3); Maleng v. Cook, 490 U.S. 488, 490, 109 S. Ct. 1923, 104 L. Ed. 2d 540 (1989). The federal habeas statute requires that the petitioner be in custody "under the conviction or sentence under attack at the time his petition is filed." Lee v. Stickman, 357 F.3d 338, 342 (3d Cir. 2004) (quoting Maleng, 490 U.S. at 490-91).

Third court has subject matter jurisdiction under § 2241 to consider the instant petition because petitioner challenges the legality of his CCC placement by the BOP under federal law, and he was incarcerated in New Jersey at the time he filed the petition. See Woodall v. Fed. Bureau of Prisons, 432 F.3d 235, 242-44 (3d Cir. 2005); see also Spencer v. Kemna, 523 U.S. 1, 118 S. Ct. 978, 140 L. Ed. 2d 43 (1998).

(3)

## PROCEDURAL HISTORY

The petitioner, Elmer Parker, who is currently confined at F.C.I. Schuylkill, in Minersvill, Pa. exhausted his administrative remedies fully to the B.O.P., being denied on March 19, 2010. Requesting CCC/Halfway house placement of 12 months. See the attached Administrative Remedy No: 557286-A1 (BP 11). The petitioner now follows with a challenge to this decision by motion § 2241. exhibit A

## REASON FOR THE PETITION

The petitioner, Elmer Parker, is requesting 12 months CCC/Halfway house placement, reason being:

1. His need is exceptional; one that exceeds normal consideration of what is the typical needs of others.

2. The transition, back into society poses a much greater, challenge for Parker than what would be the needs of the average person.

3. The 12 month request is needed to ensure Parkers' greatest likelihood of a successful transition, and adaptation back to society, and accepting responsibility for him-self, with health problems, that has rendered him disable, since the year of 2000.

(4)

4. Congress and the B.O.P. had implemented a plan to accomodate the petitioners request. The Petitioner Parker brings his claims under the:

 (1) Provision of the Second Chance Act.

 (2) The purpose and scope of CCC placements.

 (3) The standards this court has suggested in Strong v. Schultz, 599 F.Supp. 2d 556, (3rd Cir. 2009)

 (4) The individual needs of the petitioner.


The U.S. Dept. of Justice are in support of utilization of the half-way house programs and placement, as stated in policy statement 7310.04, Community Corrections Center. The purpose and scope, is to provide guidelines to staff regarding the effective use of Community Corrections Centers (CCC). This program statement defines placement criteria for offenders, requires that staff members start the place-ment process in a timely manner, and defines the circumstances when inmates may refuse Community Corrections (CC) programs. It also establishes an operational philosophy for CCC referrals that, when-ever possible, eligible inmates are to be released to the community through a CCC unless there is some impediment as outlined with the policy statement itself.

RRC/CCC or as it is most commonly called, "The Half-way House" program, provides an excellent transitional environment for inmates nearing the end of their sentence. The level of structure and supervision assures accountability and program opportunities in employment counseling and placement. Participating in community-

(5)

based transitional services may reduce the likelihood of an inmate
with limited resources from recidivating, and this is the focus of
Parker's claims, requests, and purposes. This program and the place-
ment of 12 months, would afford him avenues to prefect other area's
of concerns that he will encounter upon him being released from
prison and re-entering into society. Congress also, has supplemented
this already established program, to afford upon reasonable con-
sideration the placement of 12 months into such a program.
See the 2007 Second Chance Act, 18 U.S.C. §§ 3621 and 3624.

However, the B.O.P. has had some difficulties in how to decide
and what to consider in their determination process, to place an
inmate in RRC for a period of 12 months.

The petitioner will offer this court the understanding of
Strong v. Schultz, 599 F.Supp. 2d 556, U.S. Dist. LEXIS 15332
(2009 3rd Cir.) to ask for this standard of consideration.

**CASE SUMMARY**

**PROCEDURAL POSTURE:**

Petitioner prisoner filed an application for a writ of habeas
corpus under 28 U.S.C.S. § 2241 challenging the date set by respon-
dent (BOP) for his pre-release custody placement in a residential
re-entry center or community corrections center (CCC). Prisoner was
granted 28 U.S.C.S. § 2241 habeas relief because BOP, in determining
community corrections center (CCC) placement, abused it discretion
in relying on memorandum, which constrained staff discretion to
designate inmates to CCC for duration that would provide greatest
likelihood of successful reintegration, contrary to 2nd Chance Act.

(6)

**OVERVIEW:**

The BOP determined that the prisoner was entitled to 6 months'
pre-release custody placement in a CCC until his release date. The
prisoner's habeas petition sought a CCC placement of 12 months.
The court had subject matter jurisdiction under § 2241 to consider
the petition because the prisoner challenged the legality of his CCC
placement under federal law and was incarcerated in New Jersey at
the time he filed the petition. The court excused the failure to
exhaust administrative remedies because, given that it took 5 months
to exhaust adminstrative remedies the first time around, dismissal
of the petition as unexhausted would moot the 28 U.S.C.S. § 2241 claim
through no fault of the prisoner's. The court held that, by denying
staff the discretion to recommend a placement longer than 6 months,
without advance written approval, the BOP's memorandum was incon-
sistent with the Second Chance Act's amendments to 18 U.S.C.S.
§ 3624(c). Accordingly, because the prisoner's CCC placement was
determined pursuant to those impermissible limitations, the BOP
abused its discretion in determining that the prisoner's placement
would be for 6 months.

**OUTCOME:**

The court granted the writ and remanded the matter to the BOP
for re-determination of the prisoner's placement date. The court
instructed the BOP to consider the prisoner for a longer placement
in a CCC in accordance with the Second Chance Act and without regard
to the memorandum. The Second Chance Act modifies 18 U.S.C.S. §
3624(c) by:

(7)

(1) doubling the pre-release placement period.

(2) requiring the Bureau of Prisons to make community correct-
tions center placement decisions on an individual basis

(3) requiring the BOP to ensure that, consistent with the
factors in 18 U.S.C.S. § 3621(b), the duration of the
placement period gives the inmate the greatest likelihood
of successful community reintegration.

18 U.S.C.S. § 3624(c). Obviously, an underlying premise of these
amendments is that the more time an inmate spends in a CCC before
he or she is released from BOP custody, the more likely it is that
his or her community reintegration will be successful.

The Second Chance Act, 18 U.S.C.S. §§ 3621, 3624, limits the
(BOP)'s discretion in determining the placement duration by require-
ing that each placement is of sufficient duration not to exceed
12 months to provide the greatest likelihood of successful reint-
egration into the community. 18 U.S.C.S. § 3624(c)(6). By increasing
the placement period to 12 months and requiring the BOP to ensure
that placements are long enough to provide the greatest likelihood
of successful reintegration, Congress intened that each inmate
would be considered for a placement of the longest duration, 12 months,
although the ultimate placement may be less than 12 months, if
warranted by application of the 18 U.S.C.S. § 3621(b) factors, namely
the nature and circumstances of the offense, the inmate's history
and pertinent characteristics, and any statement by the sentencing court.
court.

(8)

The BOP abused its discretion in the manner they decided the petitioner's
request. Through counsel, the petitioner STRONG had argued that
he was deprived of "the individualized consideration" for RRC place-
ment for a period of up to one year on the basis of the neutral
criteria indentified by congress in 18 U.S.C. § 3621(b). "Instead
of striving to implement the intent of congress," to provide the
greatest likelihood of successful reintergration into the community.
The petitioner Parker must reiterate this standard of consideration
and now that the courts and the BOP has some established history in
determining whether an inmate needs — fits the provisions as out-
lined by congress to consider an individual for a period of 12
months placement in RRC.

## THE PETITIONER PARKER REQUEST, POSES AN UNIQUE SITUATION.

Elmer Parker request 12 months placement in the RRC program to
afford him the greatest likelihood of successful reintergration
into the community. But Parker's situations extends beyond the
provisions set out in the Second Chance Act. Parker asks for con-
sideration besides those provisions, and not only the individual needs
of the petitioner but to have an "understanding", of the responsi-
bility I have to my son's needs and view my situation from that of
a parent besides being an inmate. "Parker being a parent," that need
to give more to his son than he has to give; a parent who needs to
prepare to give his organs if it is able to be done; a parent who has

(9)

came to the cross-roads of life and realizes "the value of freedom," to allow him to be in a postition to be able to aid in the process that could save his son's life. Without making self-serving statements the petitioner will present as much evidence from the best records he has available to support his request.

A point to consider: 18 U.S.C. § 3553(a), supports a finding that in imposing a sentence, the sentencing goal is to consider the "need for rehabilitation" as well as punishment for the crime. Parker's request, absorbs issue's and concerns that extends beyond just reintergration back into the community, but affords him the seed that will assist development in all other area's of life's responsibilities. Planning starts now and each step is essential. I need the year half-way house in various ways so that it would help promote my successful transition back into society, in some ways if considered under the same standards of Strong − − − compounded by the "personal" and individual needs that the Second Chance Act offers. The court would see that Parker's request should be granted.


FACTS:  see exhibit B

(1). I am now 37 yes old, and have 4 children. My son Elijah has serious health problems at a young age. He needs a kidney, and has growing complications. Medical records will be submitted to support this statement. My son is No #1 on a kidney donors list. Call Winthrop-University Hospital/Winthrop Pediatric Associates, Children's Kidney and Bladder Center, 120 Mineola Blvd Suite 210, Mineola, NY 11501. Per: Manju Chandra, MD, FAAP Chief, Pediatric

(10)

Nephrology.

This 12 month placement would not only afford me to be able to physically hold my son, and give him moral support but to be able to physically have myself evaluated if I could donate my kidney to my son.

My son and I both have, O+ blood type that is rare in itself, if in the event it becomes necessary, I want to be available and this requires pre-planning. See exhibit B

The prison staff is aware of my son's condition and has been very considerate, in allowing me additional phone minutes in which was for the communication with my son, sometimes from a hospital bed. See exibit C

The 12 month half-way house program would provide me a greater time period to adjust, and further accept my responsibilities as a father to prepare myself, and have doctors to examine and evaluate my organs for possible removal.

(2) I have a health problem myself. I've been declared disable since the year 2000. I recieve social security benefits. Call any Social Security Adminstration Agency. I am 6'3" and weigh 300+ pounds. I have chronic asthma. I need the 12 month half-way house program to get connected with all avaliable resource's Centers and Agencies. I need respiratory products, also to reapply for medicare, and social security. This process often takes a 1 year time period in itself. I'll need some form of income, but the half-way house would provide me with housing until that determination process is done over again. Social Security evaluations determine the process in

(11)

into which my benefits are provided. Being in a large city, this process often can be lenthy. see exhibit D

(3) When I left the streets, I was a notable member of the Bloods. I've since renounced my association, while in prison as well as in my community. There will be adjustments I'll have to face and handle with discernment, adapting to my changed life-style. The extended prison time in the RRC, will aid in this adjustment.

(4) My son may need additional health-care coverage, and medical attention, that the present insurance does not cover. Although, I am or at least prior to my prison incarceration, re-cieving social security benefits, and did not have gainful employ-ment. I was working toward, employment in the entertainment business. See Exhibit E. The petitioner had an offer to sign a contract with Recording label of **Shady Records/Eminem (ex.E)**, the famous Rap pro-ducer, and performer, and still has this opportunity. If successful as planned, the income could work wonders for my son. I still have the opportunity to do so, the production company has contacted me as recent as Feb. 2010, to check my prison release status. With a few months in a studio, I could be ready to accept that challenge, will still having all other prepared plans actively in operation to achieve the best possible result for my son, myself, and my community plus family, while for-filling my obligations to the B.O.P. This would afford me the time needed to adjust plan, prepare, and adapt and accept all responsibilities that I'll inherit upon exiting prison, while still serving my prison sentence. Living as example of a completely reformed and rehabilitated productive member of

(12)

society. Let alone being an example to my community of no longer
being apart of a gang, or supporting that lifestyle or conduct.
The" 12 month half-way house", would water the seed, that the time
I spent in prison and the needs of my son have - - - instilled in me
to do better and achieve the goals that I've set to accomplish.
While in the RRC program all the necessary and essential ingredients
that are a part of my pre-release plan can be nurtured and proned.
The half-way house itself provides classes, designed to educate,
inform, improve one's social skills, living skills, problem solving
with relationship issue's, and other supporting aspects that helps
one with re-establishing himself to street life. This would be a
golden opportunity for myself and would benefit all parties who would
have an interest in my success, to include, the BOP, society, all in
the intents of congress' purpose of the Second Chance Act. I am the
model candidate for such program, and ask to be placed in RRC FOR A
PERIOD OF 12 MONTHS.

**RRC** assignments are governed by 18 u.s.c. § 3624(c)(1), which
provides as follows:

     The Director of the [BOP] shall, <u>to the extent practicable</u>,
ensure that a prisoner serving a term of imprisonment spends a
portion of the final months of that term (not to exceed 12 months),
under conditions that will afford that prisoner a reasonable oppor-
tunity "<u>to adjust to</u>"and prepare" for the re-entry of that prisoner
into the community. Such conditions may include a community
correction facility. 19 U.S.C. § 3624(c)(1). congress has granted
the BOP not only the discretion to determine where to house an in-

(13)

mate, but also the discretion to determine, through <u>the individualized</u>
<u>consideration</u> required by the SCA, the length of an inmates RRC
placement. See id. § 3624(c)(6) (requiring the BOP to issue new
regulations designed to ensure the RRC assignments are:

 (a) conducted in a manner consistent with section 3621(b) of
   this title;

 (b) determined on a individual basis;

 (c) sufficient duration to provide the greatest likelihood
   of successful reintegration into the community.
   (emphasis added).

Further, the statute sets the maximum amount of time that a prisoner
can spend at a RRC, as not more than 12 months, but does not set any
minimum amount of time that a prisoner must spend at a RRC. Id.
§ 3624(c)(1); see also Miller v. Whitehead, 527 F.3d 752, 756
(8th Cir. 2008) (quoting § 3624(c)(1)); Stewart v. Cruz, No. 08-4380
(ADM/RLE), 2008 U.S. Dist. LEXIS 112231, 2008 WL 3893600, at *2
(D. Minn. Aug. 20, 2008) (The statute itself clearly indicates, on
its face, that the BOP is to determine, <u>on an individual basis</u>, how
much time each Federal Prisoner should spend at an RRC. The statute
sets a maximum amount of time that a prisoner can spend at an RRC--
not more than twelve (12) months--but the statute does not set any
minimum amount of time that a prisoner must spend at an RRC). And
neither the SCA nor any other statutory authority requires transfer
of an inmate to a RRC. See Elwood v. Jeter, 386 F.3d 842, 847 (8th
Cir. 2004) (18 U.S.C. § 3624(c) does not require placement to a CCC.
It only obligates the BOP to facilitate the prisoners transition

(14)

from the prison system...The obligation is qualified by the phrase
"to the extent practicable."); see also 18 U.S.C. § 3624(c)(4)
(providing that the statute does not limit or restrict the authority
of the BOP under 18 U.S.C. § 3621(b), to designate the place of the
prisoner's imprisonment).

Elmer Parker request, fits squarely into the design and intents
of congress, and if this court and the staff of the BOP, would apply
the two approaches in their accessment of its determination in the
present case.

(1) the individualized consideration

(2) to the extent practicable....

Parker has stated and submitted, more conviencing evidence than can
be disputed of his situation he will inherent by the acceptances of
his responsibility, to himself, his son, his family, to his com-
munity, as an example of a reformed rehabilitated prior convicted
felon. Success can be achieved, if giving all practicable tools and
opportunities, based on my individualized need. This vision that is
before me was the result of the findings of the study that prompted
congress to give a person in my situation the greatest possible
likelihood of success to make a positive transition back into
society and naintaining that success, of course one must also be
"willing". Elmer Parker is willing to commit to change. My resp-
onsibilities of life and the health of my son, my new attitude
towards life in general, to include my age suggest that recidivism
risk is greatly reduced. Recidivism rates decline relatively con-
sistently as age increase". From 35% under age 21, to 9.5% over
age 50. See CHC of the Fed. Sentencing Guidelines page 12.

(15)

## IN CLOSING

The petitioner will submit this court the purpose and findings of the study that now affords me this Second Chance. I believe the 1st opening phrase say it all, See (April 9, 2008 P.L. 110-199, § 3, 122 Stat. 658):

(A) Purpose, the purposes of the Act are-

(1) TO BREAK THE CYCLE OF CRIMINAL RECIDIVISM.

The Second Chance act, and the placement of 12 months would give me the view of living in prison while living in free society at the same time. Observing what is behind me while seeing what life can offer me in the present future. It would be the awakening of the reality of "CHOICES", we are a product of our own choices. I respectfully request to be placed in the RRC program for a period of 12 months. See Exhibit E F.

Respectfully submitted,

Elmer Parker # 68949-053
FCI-Schuylkill
Po Box 759
Minersville, Pa 17954



# PROOF OF SERVICE

I certify that on _4/20/2010_ (date) I mailed a copy of this brief and all attachments via first class mail to the following parties **at the addresses listed below**:

Clerk of Courts
235 N. Washington Ave
Scranton , Pa, 18501


# PROOF OF SERVICE FOR INSTITUTIONALIZED OR INCARCERATED LITIGANTS

In addition to the above proof of service all litigants who are currently institutionalized or incarcerated should include the following statement on all documents to be filed with this Court:

I certify that this document was given to prison officials on _4/20/10_ (date) for forwarding to the _Clerk of Courts_  I certify under penalty of perjury that the foregoing is true and correct.  28 U.S.C. §1746.

_____
Signature

Dated: _April 20 2010_

*O:\FORMS\CHKLISTS\Briefs_Appendix\InformalBrief.wpd*

REV.  02/95                    6

EXHIBIT A

**Administrative Remedy No. 557286-A1**
**Part B - Response**

This is in response to your Central Office Administrative Remedy Appeal in which you request 12 months Residential Reentry Center (RRC) placement.

The issue of RRC recommendation is within the authority of the Warden as set forth in Program Statement (P.S.) 7310.04, Community Corrections Center (CCC) Utilization and Transfer Procedure. Determinations are based on the individual's needs, existing community resources, institutional adjustment, length of sentence, and the need to provide for the safety and security of the general public. As a result of the Second Chance Act of 2007, recommending RRC placement and the length also involves an individual assessment of five factors from 18 U.S.C. § 3621(b) that include the resources of the facility contemplated, the nature and circumstances of the offense, the history and characteristics of the prisoner, any statement by the court that imposed the sentence, and any pertinent policy statement issued by the U.S. Sentencing Commission.

Our review revealed the Warden and Regional Director have adequately addressed the issues raised in your appeal. You were evaluated for pre-release RRC placement pursuant to the Second Chance Act. Upon review of your individual case, along with consideration of the above factors and the criteria in 18 U.S.C. § 3621(b), staff determined an RRC placement of 180 days was appropriate for your transitional needs. Staff refer inmates for pre-release placement to the appropriate Community Corrections Manager (CCM), but the final decision as to the community program or placement length is within the discretion of the CCM. You will be notified of the final decision. We concur with the actions of staff and find them appropriate.

Your appeal is denied.

_March 19, 2010_
Date

_Harrell Watts, Administrator_
National Inmate Appeals

**U.S. Department of Justice**

Federal Bureau of Prisons

**Central Office Administrative Remedy Appeal**

Type or use ball-point pen. If attachments are needed, submit four copies. One copy each of the completed BP-229(13) and BP-230(13), including any attachments must be submitted with this appeal.

From: __PARKER ELMER__ ____68949-053__ __3-B__ __F.C.I. Schuylkill__
LAST NAME, FIRST, MIDDLE INITIAL    REG. NO.    UNIT    INSTITUTION

**Part A - REASON FOR APPEAL**

Elmer Parker appeal is based on the factor's considered verses the needs of the petitioner's; the authority of the Policy Statement verses the intents of Congress for implementing the Second Chance Act; the Policy statement verses the Statute, 7310.04 verse 18, U.S.C. 3624, I have personally contacted owners/manager of a Half-way House in my sentencing district and they have confirmed, they can house's and have bed space for such persons to serve 1 year in its program. Concerning my son need for the Kidney, I must be out of prison in order for the proper test can be preformed to determine if I am a match, this need to be done in advance. I need 12 month to prepare for this, very possible course of action, among other necessary rehabilitation needs.

__11-26-09__
DATE

__Elmer Parker JR.__
SIGNATURE OF REQUESTER

**Part B - RESPONSE**

_____    _____
DATE    GENERAL COUNSEL

ORIGINAL: RETURN TO INMATE    CASE NUMBER: _____

**Part C - RECEIPT**

CASE NUMBER: _____

Return to: _____
LAST NAME, FIRST, MIDDLE INITIAL    REG. NO.    UNIT    INSTITUTION

SUBJECT: _____

_____    _____
DATE    SIGNATURE OF RECIPIENT OF CENTRAL OFFICE APPEAL

UPN LVN    PRINTED ON RECYCLED PAPER    BP-231(13)
JUNE 2002

```
   SCHUW   540*23  *              SENTENCE MONITORING            *      06-23-2009
PAGE 001           *                COMPUTATION DATA            *      13:09:52
                                   AS OF 06-23-2009

REGNO..: 68949-053 NAME: PARKER, ELMER


FBI NO...........: 777756RA2               DATE OF BIRTH: 12-17-1972
ARS1.............: SCH/A-DES
UNIT.............: 3                        QUARTERS.....: C07-216L
DETAINERS........: NO                       NOTIFICATIONS: NO

PRE-RELEASE PREPARATION DATE: 10-29-2011

THE FOLLOWING SENTENCE DATA IS FOR THE INMATE'S CURRENT COMMITMENT.
THE INMATE IS PROJECTED FOR RELEASE:  03-21-2012 VIA GCT REL


---------------------CURRENT JUDGMENT/WARRANT NO: 010 ---------------------
COURT OF JURISDICTION...........: NEW YORK, EASTERN DISTRICT
DOCKET NUMBER...................: CR-04-915-01
JUDGE...........................: FEUERSTEIN
DATE SENTENCED/PROBATION IMPOSED: 11-07-2006
DATE COMMITTED..................: 04-14-2008
HOW COMMITTED...................: US DISTRICT COURT COMMITMENT
PROBATION IMPOSED...............: NO

                FELONY ASSESS  MISDMNR ASSESS  FINES          COSTS
NON-COMMITTED.: $100.00        $00.00          $00.00         $00.00

RESTITUTION...:  PROPERTY:  NO  SERVICES:  NO       AMOUNT:  $00.00

------------------------CURRENT OBLIGATION NO: 010 ------------------------
OFFENSE CODE....:  136
OFF/CHG: 18:922(G)(1) AND 924(A)(2) POSSESSION OF A FIREARM BY A FELON

  SENTENCE PROCEDURE.............: 3559 PLRA SENTENCE
  SENTENCE IMPOSED/TIME TO SERVE.:   100 MONTHS
  TERM OF SUPERVISION............:    3 YEARS
  NEW SENTENCE IMPOSED...........:    55 MONTHS
  BASIS FOR CHANGE...............: COURT ORDER MODIFYING SENTENCE
  CLASS OF OFFENSE...............: CLASS C FELONY
  RELATIONSHIP OF THIS OBLIGATION
   TO OTHERS FOR THE OFFENDER....: C/S TO NY STATE SENT
  DATE OF OFFENSE................: 06-30-2004




G0002      MORE PAGES TO FOLLOW . . .
```

EXHIBIT B

February 28, 2007

*1 Gustave L Levy Place*
*New York NY 10029*

Corrine Benchimol, M.D.
Mount Sinai Medical Center

RE:       **ELIJAH XAVIER PARKER**
DOB:      **12-04-92**

Dear Corrine:

I am referring **Elijah Xavier Parker,** a 14-year-old African American boy to you for
evaluation of live related renal transplantation. I first saw him on February 26, 2007,
when he was transferred from Nassau University Hospital for management of end
stage renal disease. Elijah was diagnosed with nephrotic syndrome at 8 years of age
and was initially steroid responsive with multiple relapses in the next year and half.
He then became steroid unresponsive. A renal biopsy showed minimal changes. He
was treated with Cytoxan with partial remission. In the summer 2005, he relapsed and
did not remit thereafter. A repeat renal biopsy in November 2005 was reported to
have focal segmental glomerulosclerosis. He was treated with mycophenolate mofetil
for six months without change in his proteinuria. He was started on cyclosporine 100
mg twice a day about two months ago. Third renal biopsy performed at Stony Brook
on 2/7/07 showed 62 glomeruli of which 39 were globally sclerotic and 20 had
segmental sclerosis; there was significant tubulointerstitial inflammation and fibrosis.

Xavier's renal function has declined extremely rapidly in the last five months. His
serum creatinine was 0.7 mg% in September 2006, 1.3 mg/dL on October 14, 2006,
1.2 mg/dL in November 2006, 2.6 mg/dL on December 02, 2006, 3.1 mg/dL on
January 12, 2007, and 5.3 mg/dL on February 21, 2007. At his admission to
Nassau University Hospital on February 21, 2007, his serum albumin was 1.6 g%
,blood bicarbonate 16 mMol/L and hematocrit 29% and he received albumin
infusions for three days for diuresis.

February 28, 2007                                                    Page 2.

RE:        **ELIJAH XAVIER PARKER**
DOB:       **12-04-92**

On admission to SCH, his serum creatinine on February 27, 2008, was 7.7 mg% with BUN 45 mg% and cholesterol greater than 400 mg%. His T4 level was low and TSH level high hence, he was started on Synthroid 75 mcg per day.

His present medications consist of Nifedical XL 90 mg daily, labetalol 300 mg twice a day, Rocaltrol 0.25 mcg daily, PhosLo 660 mg caps 2 caps t.i.d., Epogen 8000 units subcut every week , famotidine 20 mg p.o. twice a day, Lasix 60 mg p.o. daily, Zaroxolyn 5 mg q.d., enalapril 5 mg qd 9 started on 3/1/07)and ferrous sulfate 325 mg twice a day. The cyclosporine was discontinued.

His mother is a willing donor. Elijah is O+ve, but the mother's blood group is not known. The father is not in the picture. The other siblings are all younger than 18 years of age. In case, the mother does not turn out to be a suitable donor, the family will opt for chronic peritoneal dialysis.
    His mother is aware of the risk of recurrence of proteinuria in the transplanted kidney. The family has an appointment with you on March 06, 2007. The social worker in your division was informed of the patients health insurance from Affinity Medicaid.

Thanks for accepting to see Elijah.

With best personal regards.                    *I was not in the picture due to being in prison.

Yours sincerely,

Manju Chandra, M.D.
Division of Pediatric Nephrology
Schneider Children's Hospital at North Shore
Professor of Pediatrics
NYU School of Medicine

MC:tsi/tt

11

Queens. Prior to his incarceration for the instant offense, the defendant was reportedly the custodial parent for those three children. The three children are cared for by the defendant's mother, who is unemployed. Neither the defendant nor his mother had contact information for Ms. Wilson, and a directory assistance telephone listing could not be independently located for her. Elijah Parker (age 13) was produced as a result of the defendant's non-marital relationship with Patricia Fells (age 35). The defendant advised that Elijah Parker resides with his mother in Roosevelt, New York. He further advised that he was in frequent contact with his son and voluntarily provided child support on an "as needed basis." The defendant advised that his son Elijah suffers from "nephronic syndrome," a kidney disorder which causes high levels of protein in the urine and swelling resulting from the buildup of salt in the body. The defendant stated that if his son ingests salty foods, he requires hospitalization. The undersigned attempted to contact Ms. Fells on several occasions; however, there has been no answer at her telephone number and no means by which to leave a message. A letter has been sent to Ms. Fells, and the Court will be notified upon her response. Notably, the defendant's Equifax report lists a child support collection account with a balance of $5,500. During the home visit, the defendant's mother presented birth certificates for Jalon Parker, Shamear Parker, and Jamia Wilson. The defendant did not provide a birth certificate for Elijah Parker.

39.    The defendant stated that he has always lived in Roosevelt, New York, with the exception of a brief period of time in his childhood when the family resided in Freeport, New York.[1] A home visit revealed that the defendant's family lives in a low-income neighborhood of Roosevelt, New York. The home, which is adequately furnished and maintained, contains seven bedrooms, two bathrooms, a kitchen, and two small living rooms. The defendant's mother, sister (Brenda Parker), and two of his children (Shamear Parker and Jamia Wilson) were present during the home visit.

40.    The defendant advised that he is a member of the Velt Gangsta Lanes set of the Bloods, a violent street gang. He noted, however, that he has severed ties with the other members of the gang. No further questions were posed, as Defense Counsel was absent during the presentence interview.

41.    An interview was conducted with the defendant's sister, Brenda Parker, during the home visit. Ms. Parker described the defendant as a "likeable, pleasant, giving" individual, who is a "good father" to his children. She opined that the defendant became involved in the instant offense by associating with "the wrong people." Ms.

---

[1]The defendant's driver's license lists an address in Johnson City, New York; however, he noted that he has never lived in that city. He advised that he briefly considered relocating to Johnson City, which is located near two of his sisters' residences in Binghamton.

**Winthrop Pediatric Associates**
**Children's Kidney & Bladder Center**
120 Mineola Blvd Suite 210
Mineola, NY  11501
Phone: 516-663-4600  Fax: 516-663-8297

Patient Name: _Elijah Parker_
Date of Birth: _12/4/92_
Date of Visit: _5/31/08_
Referring MD: _____

____ Initial Consult     ✓ Follow up          Allergies: _____

Ht: _162cm_ Wt: _42.7kg_ B.P. _114/74_

**History:** _____

— Wearing same size clothes × 3 yrs
— feels ok on dialysis ( hot
    dialysis )
  Only 2 cm ↑ in Ht since 9/07
  On list at Mt Sinai
  B/P better control c fluid removal
— getting home tutoring T.T.S.
  Tutoring during dialysis in Child
  Life program M W F

| U.A. | |
|------|---|
| GLU | _____ |
| KET | _____ |
| SG | _____ |
| BLO | _____ |
| pH | _____ |
| PRO | _____ |
| NIT | _____ |
| LEU | _____ |
| Other: | _____ |

**PHYSICAL EXAM:**
HEENT ___N___          Lower Ext ___✓___
Heart ___✓___          Spine ___✓___
Lungs ___✓___          Ext. Genitalia ___Tanner II pubic hair___
Abd ___✓___

| | |
|---|---|
| RBC/hpf | _____ |
| WBC/hpf | _____ |
| Cast/hpf | _____ |

**Assessment:**
✓ Growth rate, 2 cm from
  9/17/07
  Delayed Puberty
  CKD VI

**Plan/Treatment:**
To start hGH

**Lab Results:** _____
  ↑ PTH
  emphasized $CaCO_3$
  wbc

**Medications:** Nephrocap 1 cap ↓↓
  ↑ $CaCO_3$  2 tab tid ( no nt
  — off Endepol. Cholestol?     taking
  — Epogen                     occasical
  — Heelux

Thank you for your referring this patient and allowing me participate in their care.

Return Visit _____

_Manju Chandra, MD, FAAP_
**Manju Chandra, MD, FAAP**
**Chief, Pediatric Nephrology**

PATIENT INFORMATION
**PARKER,ELIJAH**

REPORT STATUS **Final**

QUEST DIAGNOSTICS INCORPORATED
CLIENT SERVICE 800.631.1390

DOB:              Age: NONE
GENDER: M    Fasting: N

ORDERING PHYSICIAN
**CHANDRA,MANJU**
CLIENT INFORMATION
894253
WPA-CHILDREN S KIDNEY VOIDING DYSI
120 MINEOLA BLVD.
SUITE 201
MINEOLA, NY 11501

SPECIMEN INFORMATION
SPECIMEN:    C4301792
REQUISITION: NONE
LAB REF NO:

COLLECTED:  01/09/2008    16:00
RECEIVED:   01/09/2008    20:48
REPORTED:   01/11/2008    09:50

| Test Name | In Range | Out of Range | Reference Range | Lab |
|---|---|---|---|---|
| CREATININE W/EGFR | | | | LI |
| CREATININE | | 2.14 H | 0.50-1.30 mg/dL | |
| EGFR NON AFR AMERICAN | | | >=60 mL/min/1.73m2 | |
| | | Age and/or gender not provided. Unable to calculate. | | |
| CBC (INCLUDES DIFF/PLT) | | | | LI |
| WBC | 5.2 | | 3.8-10.8 Thous/mcL | |
| RBC | | 4.01 L | 4.20-5.80 Mill/mcL | |
| HEMOGLOBIN | | 11.6 L | 13.2-17.1 g/dL | |
| HEMATOCRIT | | 33.8 L | 38.5-50.0 % | |
| MCV | 84.3 | | 80.0-100.0 fL | |
| MCH | 29.0 | | 27.0-33.0 pg | |
| MCHC | 34.3 | | 32.0-36.0 g/dL | |
| RDW | | 15.8 H | 11.0-15.0 % | |
| PLATELET COUNT | 246 | | 140-400 Thous/mcL | |
| MPV | 8.1 | | 7.5-11.5 fL | |
| TOTAL NEUTROPHILS,% | 53.9 | | 38-80 % | |
| TOTAL LYMPHOCYTES,% | 33.6 | | 15-49 % | |
| MONOCYTES,% | 8.5 | | 0-13 % | |
| EOSINOPHILS,% | 3.5 | | 0-8 % | |
| BASOPHILS,% | 0.5 | | 0-2 % | |
| NEUTROPHILS,ABSOLUTE | 2803 | | 1500-7800 Cells/mcL | |
| LYMPHOCYTES,ABSOLUTE | 1747 | | 850-3900 Cells/mcL | |
| MONOCYTES,ABSOLUTE | 442 | | 200-950 Cells/mcL | |
| EOSINOPHILS,ABSOLUTE | 182 | | 0-550 Cells/mcL | |
| BASOPHILS,ABSOLUTE | 26 | | 0-200 Cells/mcL | |
| DIFFERENTIAL | An instrument differential was performed. | | | |
| TACROLIMUS (FK506) | | 19.3 H | 3.0-15.0 ng/mL | TBR |

The consensus document ("Therapeutic Monitoring of Tacrolimus
(FK506)"Ther. Drug Monit. 1995: Jusko, WJ et.al.) has
reported that the therapeutic range of Tacrolimus is not
clearly defined, but target 12-H post-dose whole blood
concentrations are 5-20 ng/mL early post-transplant, and
24-H post-dose concentrations are 33 to 50 percent less than
the corresponding 12-H levels.

-----------------------------------------------------------------------------

**Performing Laboratory Information:**

LI    Quest Diagnostics 575 Underhill Blvd Syosset NY  11791 Laboratory Director: Era Khurana, M.D.

TBR   Quest Diagnostics One Malcolm Avenue Teterboro NJ  07608 Laboratory Director: William E. Tarr, M.D.

*To fax to*
*Dr. Corinne Bench*
*Vegas*

PARKER,ELIJAH - C4301792

Page 1 - End of Report

MAR-27-2008 12:45  FROM:PED 5 NORTH 5166639214                    TO:8297                    P:1/2



# WINTHROP-UNIVERSITY HOSPITAL
### Our Patients Come First

**Patient** PARKER ,ELIJAH          **Birth Date** 12/04/1992    **Sex** M      **Rm/Bed** N55607
**Attending**                        **Pt #** 1808698           **MR #** 80068465   **Adm Date**

| CT19 | Mar 26, 2008 23:10 |
|---|---|

02,849 MOTRONI BETTY, M.D.    CT ABDOMEN WITH CONTRAST
CT of the abdomen and pelvis:

History: Status post removal of renal transplant. Evaluate for
collection.

Multiple – axial images were obtained though the abdomen and pelvis
after  administration of oral and intravenous contrast.

The visualized lung bases <are unremarkable.

The liver and spleen appear homogeneous  . The spleen appears
somewhat prominent however.  The native kidneys are small in size
consistent with the history of renal failure. The pancreas and
adrenals are unremarkable.

The small and large bowel are of normal caliber. Evaluation is
somewhat limited due to the poor oral contrast opacification. There
is focal infiltration of the subcutaneous fat with low density
extending through the anterior abdominal wall musculature. This
connects to an irregular low density collection with an ill-defined
enhancing wall which extends inferiorly into the right lower
quadrant. The collection measures 2.9 x 1.4 cm in greatest diameter
on image 97 and measures 4.2 cm in craniocaudal extent . There is a
focus of gas in this collection on image 99. There is infiltration of
the adjacent fat. The differential diagnostic possibilities include
abscess collection and seroma. This was discussed with Dr. Grossman
on 3/27/2008 at 11:45 p.m. There are scattered subcentimeter left
paraaortic , aortocaval and paracaval nodes.

The urinary bladder is only partially distended limiting evaluation.
There is a question of urinary bladder wall thickening versus under
distention.

Impression:
Limited due to poor oral contrast opacification
Irregular gas containing collection in the right lower quadrant
measuring 2.9 x 1.4 x 4.2 cm may represent abscess versus seroma.
Correlate clinically
Other findings as above


3/26/08 PT IS IN DIALYSIS UNTIL 4:30PM ~ WE WILL CALL BACK FLOOR WHEN PT IS

| Page created: Thursday, March 27, 2008 2:02 PM For: RE7177 |
|---|

Ruth Badler, D.O.
Dan Barlev, M.D.
Brian Buonocore, M.D.
Asante Dickson, M.D.
Barbara L. Eisenkraft, M.D.
Susana H. Fuchs, M.D.
Sidney Glanz, M.D.
Man Hon M.D.
Gerald A.L. Irwin, M.D.
Douglas S. Katz, M.D.



**WINTHROP**
RADIOLOGY ASSOCIATES, P.C.
*Care Without Compromise*

120 Mineola Blvd., Suite 10, Lower Level, Mineola, NY 11501
Phone 516-663-4510  Fax 516-663-3699
www.winthrop-radiology.com

Anca Kranz, M.D.
Richard A. Losada, M.D.
Jonathan S. Luchs, M.D.
Sabrina Mahboob, M.D.
A. Orlando Ortiz, M.D.
Donald B. Price, M.D.
Rakesh Shah, M.D.
Wei Wen Sung, M.D.
Sharon Taylor, M.D.
Elizabeth Yung, M.D.

---

General Radiology   Multi Detector CT Scan   MRI   Nuclear Medicine   Ultrasound

Chandra, Manju
Chandra, Manju
120 MINEOLA BOULEVARD
MINEOLA, NY 11501

Re: PARKER, ELIJAH
DOB:  12/04/1992    16 Y
MRN:  D00600048526

---

### HIPS BILATERAL
Thursday, April 2, 2009

CLINICAL HISTORY: Low back pain. Bilateral hip pain.

PELVIS AND BILATERAL HIPS: Frontal view of the pelvis and frog-lateral views of the hips were obtained bilaterally and demonstrate widening and medial slipping of the epiphysis consistent with underlying slipped capital femoral epiphysis. The trabecular pattern of the osseous structures appears coarse likely related to the patient's known renal failure. The remainder of the examination is unchanged from the prior study from 11/18/2008.

IMPRESSION:

Findings consistent with bilateral slipped capital femoral epiphysis.

The above findings were discussed with Dr. Chandra the at 2:23 p.m. via telephone on the date of the examination.

**THANK YOU FOR THE COURTESY OF THIS REFERRAL.**
**End of diagnostic report for accession:**    13431150
**Electronically Signed By: MAZZIE, JOSEPH DO RADIOLOGIST 04/02/2009 2:20 PM**

Ruth Badler, D.O.
Dan Barlev, M.D.
Brian Buonocore, M.D.
Asante Dickson, M.D.
Barbara L. Eisenkraft. M.D.
Susana H. Fuchs, M.D.
Sidney Glanz, M.D.
Man Hon M.D.
Gerald A.L. Irwin, M.D.
Douglas S. Katz, M.D.

Anca Kranz, M.D.
Richard A. Losada, M.D.
Jonathan S. Luchs, M.D.
Sabrina Mahboob, M.D.
A. Orlando Ortiz, M.D.
Donald B. Price, M.D.
Rakesh Shah, M.D.
Wei Wen Sung, M.D.
Sharon Taylor, M.D
Elizabeth Yung, M.D.



**WINTHROP**
RADIOLOGY ASSOCIATES, P.C.

*Care Without Compromise*

120 Mineola Blvd., Suite 10, Lower Level, Mineola, NY 11501
Phone 516-663-4510  Fax 516-663-3699
www.winthrop-radiology.com

General Radiology   Multi Detector CT Scan   MRI   Nuclear Medicine   Ultrasound

Chandra, Manju
Chandra, Manju
120 MINEOLA BOULEVARD
MINEOLA, NY 11501

Re: PARKER, ELIJAH
DOB: 12/04/1992    16 Y
**MRN:** D00600048526

## LUMBAR SPINE 4 VIEWS
### Thursday, April 2, 2009

HISTORY: Back pain.

Lumbar spine: Frontal, lateral and bilateral oblique views of the lumbar spine were obtained and demonstrate a coarsened trabecular pattern consistent with the patient's known history of renal failure. There is no fracture, or subluxation. There is spina bifida defect of the S1 vertebral body. The vertebral body heights and intervertebral disc spaces are grossly unremarkable. Incidental note is made of a nonobstructive bowel gas pattern and a prominent amount of stool within the colon.

IMPRESSION:

No fracture or subluxation.

**THANK YOU FOR THE COURTESY OF THIS REFERRAL.**
**End of diagnostic report for accession:**    13431149
 **Electronically Signed By: MAZZIE, JOSEPH DO RADIOLOGIST 04/02/2009 2:25 PM**

MAR-27-2008 12:45  FROM:PED 5 NORTH 5166639214                    TO:8297                    P:1/2



# WINTHROP-UNIVERSITY HOSPITAL
*Care Without Compromise*

**Patient** PARKER ,ELIJAH          **Birth Date** 12/04/1992   **Sex** M      **Rm/Bed** N55607
**Attending**                        **Pt #** 1808698           **MR #** 80066465   **Adm Date**

| CT19 | | Mar 26, 2008 23:10 |
|---|---|---|

02849 MOTRONI BETTY, M.D.    CT ABDOMEN WITH CONTRAST
CT of the abdomen and pelvis:

History: Status post removal of renal transplant. Evaluate for
collection.

Multiple - axial images were obtained though the abdomen and pelvis
after administration of oral and intravenous contrast.

The visualized lung bases <are unremarkable.

The liver and spleen appear homogeneous  . The spleen appears
somewhat prominent however.  The native kidneys are small in size
consistent with the history of renal failure. The pancreas and
adrenals are unremarkable.

The small and large bowel are of normal caliber. Evaluation is
somewhat limited due to the poor oral contrast opacification. There
is focal infiltration of the subcutaneous fat with low density
extending through the anterior abdominal wall musculature. This
connects to an irregular low density collection with an ill-defined
enhancing wall which extends inferiorly into the right lower
quadrant. The collection measures 2.9 x 1.4 cm in greatest diameter
on image 97 and measures 4.2 cm in craniocaudal extent . There is a
focus of gas in this collection on image 99. There is infiltration of
the adjacent fat. The differential diagnostic possibilities include
abscess collection and seroma. This was discussed with Dr. Grossman
on 3/27/2008 at 11:45 p.m. There are scattered subcentimeter left
paraaortic , aortocaval and paracaval nodes.

The urinary bladder is only partially distended limiting evaluation.
There is a question of urinary bladder wall thickening versus under
distention.

Impression:
Limited due to poor oral contrast opacification
Irregular gas containing collection in the right lower quadrant
measuring 2.9 x 1.4 x 4.2 cm may represent abscess versus seroma.
Correlate clinically
Other findings as above


3/26/08 PT IS IN DIALYSIS UNTIL 4:30PM - WE WILL CALL BACK FLOOR WHEN PT IS

| Page created: Thursday, March 27, 2008 2:02 PM For: RE7177 |
|---|

EXHIBIT C



**U.S. Department of Justice**
Federal Bureau of Prisons

FCI Schuylkill, Minersville, PA

January 7, 2010

MEMORANDUM FOR T. R. SNIEZEK, WARDEN

FROM:        J. Petrucci, Unit Manager

SUBJECT:     Request for Telephone Minutes
             PARKER, Elmer
             Reg. No. 68949-053

Unit staff have verified that inmate Parker's son suffered a mild stroke, but is in stable condition. He previously received an organ transplant and is a frequent patient at Nassau County Medical Center, NY. Parker has exhausted his telephone minutes for the month and will not revalidate until January 28, 2010. Therefore, he is requesting additional telephone minutes to maintain contact with his son and monitor his condition. The Unit Team has no objection to granting an additional 100 telephone minutes based upon these circumstances and Parker's positive adjustment at this facility.

_____ Approve 100 Minutes        _____ Deny 100 Minutes

T. R. Sniezek, Warden

EXHIBIT D

U.S.A. v. Elmer Parker
Docket No: 04-CR-915-01
Sentence Date: March 2, 2006

## ADDENDUM TO THE PRESENTENCE REPORT

### Objections

### By the Government

To date, the Government has not submitted any objections to the presentence report.

### By the Defendant

To date, Defense Counsel has not submitted any objections to the presentence report.

### Additional Information

Subsequent to the disclosure of the above-captioned individual's presentence report, the undersigned was contacted by Patricia Fells, mother of the defendant's son, Elijah Parker (age 11). Ms. Fells described the defendant as "helpful" and a "very good and caring father;" however, although the defendant was required to pay court-ordered child support in the amount of $25 on a monthly basis, he failed to do so. Ms. Fells stated that she did not expect him to fulfill this minimal support amount, due to his disability (asthma). She noted that the defendant maintained frequent contact with his son, and often took the son to doctor's appointments. Ms. Fells is employed as a teacher's aide, and is the sole care provider for Elijah Parker.

RESPECTFULLY SUBMITTED:

TONY GAROPPOLO
CHIEF U.S. PROBATION OFFICER

Prepared by:

Jennifer Connelly
U.S. Probation Officer

Approved by:

Linda Fowle
Supervising U.S. Probation Officer

Date: February 8, 2006

14

documentation of his income during this period. His statements regarding the receipt of disability benefits were corroborated by his mother.

54. Between 2000 and 2002, the defendant reportedly sold rap music albums recorded by himself. He advised that he sold his albums from "out of [his] car" in the Roosevelt, New York area. He stated that he earned between $200 and $300 per week (net) during this period. The defendant advised that just prior to his arrest for the instant offense, he was approached to enter into a contract to record his music by representatives of Shady Records, a hip-hop record company operated by artist Eminem. Due to the nature of the defendant's employment during this period, his income could not be independently verified. The defendant provided no documentation of his income during this period. His statements regarding his income during this period were corroborated by his mother.

55. From 1999 to 2000, the defendant was reportedly employed as a security guard for Phoenix Security located in Brooklyn, New York. He stated that he earned $200 per week, and left when his temporary term of employment had expired. The defendant provided no documentation of his income during this period. His statements regarding the receipt of disability benefits were corroborated by his mother. The defendant's employment during this period could not be verified, as there is no directory assistance listing for the business. The defendant provided no documentation of his income during this period. His statements regarding his employment during this period were corroborated by his mother.

56. Between 1988 and 1999, the defendant was reportedly financially supported by his mother. This information was corroborated by his mother.

57. In 1988, the defendant was employed as a cart collector at Waldbaum's Supermarket in Merrick, New York. He stated that he earned $100 per week and left due to the temporary nature of the job. A written request for verification of employment has been sent, and a response is awaited. The defendant provided no documentation of his income during this period. His statements regarding his employment during this period were corroborated by his mother.

58. Prior to 1988, the defendant was reportedly financially supported by his mother. This information was corroborated by his mother.

59. The defendant stated that he has never filed income tax returns. In response to a written request for verification, representatives of the New York State Department of Taxation and Finance advised that there are no tax records for the defendant. A written request for verification of non-filing has also been sent to the Internal Revenue Service, and a response is awaited. Based on the information provided by him, it appears that he was required to do so from 1999 to 2002.

13

48.    Medical records provided by the Nassau County Correctional Center indicate that the defendant has been prescribed an albuterol inhaler for asthma.

### Substance Abuse

49.    The defendant advised that he consumes alcohol on one occasion every two to three months. He stated that on each occasion he ingests one to two "shots" of cognac or rum.

50.    The defendant stated that he began smoking marijuana at 21 years of age and last used the drug approximately two years ago. He noted that he smoked marijuana on approximately two to three occasions per month. The defendant reported that he attended a Narcotics Anonymous program in 1998, but continued to use marijuana sporadically. The defendant's mother had no knowledge of his use of drugs or alcohol. The defendant advised representatives of the Pretrial Services Agency that he has not smoked marijuana in 10 years.

### Education and Vocational Skills

51.    Reportedly, the defendant attended the ninth through eleventh grades at Freeport High School in Freeport, New York from approximately 1987 to 1989. He advised that he left school due to his father's illness, and to attend to "family responsibilities." The defendant reported that he earned average grades and exhibited no disciplinary problems. Records of attendance have been requested, and a response is awaited. The defendant's mother corroborated his statements regarding education during this period. The defendant provided no educational documentation.

52.    Reportedly, the defendant attended the seventh and eighth grades from approximately 1985 to 1987 at Dodd Junior High School in Freeport, New York. The defendant asserted that he earned average grades and exhibited no disciplinary problems. Records of attendance have been requested, and a response is awaited. The defendant's mother corroborated his statements regarding education during this period.

### Employment Record

53.    The defendant stated that from 2002 until the date of his arrest, he received Social Security benefits due to a disability arising from his asthma. He advised that he received benefits totaling $611 per month (net). A written request for verification of the defendant's receipt of such benefits has been requested from the Social Security Administration, and a response is awaited. The defendant provided no

EXHIBIT E

1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------X

UNITED STATES OF AMERICA,          :     CR 04 915

      v.                           :     U.S. Courthouse
                                          Central Islip, N.Y.

ELMER PARKER,                      :
                                          TRANSCRIPT OF SENTENCE
            Defendant.          :
                                          November 7, 2006
------------------------------X          11:15 a.m.

BEFORE:

      HONORABLE SANDRA J. FEUERSTEIN, U.S.D.J.


APPEARANCES:

For the Government:    BENTON J. CAMPBELL
                       United States Attorney
                       100 Federal Plaza
                       Central Islip, New York 11722
                       By:  NICOLE BOECKMANN, ESQ.
                            Assistant U.S. Attorney


For the Defendant:     JASON L. RUSSO, ESQ.
                       626 Rexcorp. Plaza
                       Uniondale, New York 11556


Court Reporter:        HARRY RAPAPORT, C.S.R.
                       United States District Court
                       100 Federal Plaza
                       Central Islip, New York 11722
                       (631) 712-6105


Proceedings recorded by mechanical stenography.
Transcript produced by computer-assisted transcription.

2

1          THE CLERK:  United States v. Elmer Parker,  '04

2    CR 915.

3          Counsel state appearances.

4          MS. BOECKMANN:  Good morning, your Honor, Nicole

5    box man on behalf of the United States.

6          MR. RUSSO:  Jason Russo for Mr. Parker.

7          THE COURT:  This was a plea taken by Magistrate

8    Orenstein.

9          I have gone through the plea record, and I'm

10   satisfied that all the requirements were met, and that the

11   plea of guilty is accepted by this Court as well.

12          Now, with regard to sentencing, after the

13   pre-sentence report was issued there were some questions

14   about the enhancements and so forth.  And I understand

15   that you have arrived at a sort of -- I hate to say

16   "settlement," but a resolution of those disagreements; is

17   that correct?

18          MR. RUSSO:  Correct.

19          MS. BOECKMANN:  That's correct.

20          THE COURT:  I am going to ask the government to

21   state exactly what the resolution is, and I want

22   Mr. Parker, and, of course, you, Mr. Russo, to listen very

23   carefully to make certain that this comports with your

24   understanding.

25          MS. BOECKMANN:  Your Honor, the initial

3

1    pre-sentence report was filed giving Mr. Parker an offense

2    level that was altered in an addendum that was filed by

3    the Department of Probation on November 7th -- excuse me,

4    I think November 5th, 2006.  In the addendum they found a

5    total offense level of 30, the base offense level in

6    2K8.1A2 was found giving him a base offense level of 24.

7    He was afforded a two point enhancement for possessing a

8    firearm with a defaced serial number, and an additional

9    four points for possessing the firearm in association with

10   another felony offense.

11          The Department of Probation did not afford

12   Mr. Parker the three points for acceptance of

13   responsibility, because he did not acknowledge the

14   relevant conduct.

15          The government does not oppose the defendant

16   receiving the three points off for acceptance of

17   responsibility, to give him a total offense level of 27.

18          It is my understanding that with a

19   recommendation by the government, the defendant received

20   the low end of the guideline range, and that the defendant

21   is in agreement that his total offense level is 27, and

22   that his criminal history category is that of level four,

23   which gives him an offense level -- excuse me, a prison

24   range of 100 months to 125 months.

25          Again, it is my understanding he will not be

④

1    contesting that with the understanding that the government

2    will be making a recommendation that this Court sentence

3    the defendant at the bottom of the guideline range.

4         Additionally, the government will put on the

5    record, although it is not a promise of any sort that

6    should be relied on, but is willing to state that at this

7    time the United States Attorney's Office for the Eastern

8    District of New York does not have a present intent to

9    pursue additional criminal charges based on the four point

10   enhancement, or take that Mr. Parker is not contesting the

11   four points in any way as an admission of guilt by him on

12   that particular crime.

13        THE COURT:  Anything else, Mr. Russo?

14        MR. RUSSO:  That's my understanding, Judge.  I'm

15   in agreement.

16        MS. BOECKMANN:  Finally, your Honor, it is my

17   understanding that there is a separate state charge in

18   this case, and that the state court does have an intention

19   to run the criminal charges concurrently with the federal

20   charges.  And the government also has no opposition to

21   that.

22        That's the request by the defendant, with

23   respect to this court or the state court, your Honor.

24        MR. RUSSO:  That's correct, your Honor.

25        I can put on the record I have spoken numerous

5

1      times with William Donnino, the proceeding justice on the

2      state matter where Mr. Parker pled guilty to criminal sale

3      of a controlled substance, and the promised sentence is

4      four years there concurrent, and he has been adjourning

5      that sentence because it is that judge's intent to run

6      that sentence concurrently with the sentence to be imposed

7      here.

8                  What I am asking this Court to do, although this

9      Court is going first, so to speak, and can't direct that

10     the sentence run concurrent with the sentence that has not

11     been imposed, but that we acknowledge and understand that

12     this is the intent of the parties here that these two

13     sentences run concurrent with each other.

14                 And should the Bureau of Prisons not abide by

15     that intent, I have explained to my client that I have the

16     ability to bring him back before this Court so that he can

17     be sentenced concurrently should it not be imposed that

18     way ultimately.

19                 THE COURT:  It is really up to Judge Donnino.

20     And as long as he makes it clear what his intent is there

21     shouldn't be a problem.

22                 Now, is your client ready for sentencing?

23                 MR. RUSSO:  Yes, Judge.

24                 There is only one other request I'm making on

25     behalf of my client and his family, some of which appear

6

1    here today before the Court.

2        THE COURT:  Yes.

3        MR. RUSSO:  The bulk of Mr. Parker's family

4    reside on Long Island.  He does have some family living in

5    Upstate New York, but the bulk of them and his children

6    reside on Long Island.

7        I'm asking this Court to make a recommendation

8    to the Bureau of Prisons, and understanding you cannot

9    bind the Bureau of Prisons, but I ask this Court to

10   recommend that he be housed as near to Long Island as

11   possible, specifically Otisville Federal Correctional

12   Center.

13       MS. BOECKMANN:  Your Honor, the only additional

14   thing I would add for the record so that it is clear, is

15   that Mr. Parker understands that while the government is

16   going to recommend the low end of the guideline range,

17   like it was told to him at the time of his plea, the

18   government does not make a final determination on

19   sentencing, the Court does, after considering all the

20   factors.

21       So, even with the government's recommendation

22   this Court has a right to pursue any sentence it chooses

23   within the maximum of zero to ten years.

24       MR. RUSSO:  Obviously my client had wanted a

25   much lower sentence than 100 months and asked me to ask

7

1    the Court to consider not imposing a guideline sentence,

2    and granting him something substantially less. He has

3    asked that based upon the things he has done since being

4    incarcerated.

5            THE COURT:  I read his letters also.

6            MR. RUSSO:  He has had an exemplary record when

7    he has been housed in Nassau County as well as the Queens

8    Federal Detention Center.

9            In fact, I can tell you based on personal

10   experience speaking with the guards when I visited him on

11   numerous occasions, he is well received by the staff at

12   these facilities.  And they compliment him to me quite

13   often on how, not only does he treat the staff with

14   respect, but he assists them in keeping, so to speak,

15   order and resolving disputes on the tiers.  They enlisted

16   his help to be a mediator, and he has been very helpful to

17   them.

18           In addition, Judge, my client has made plans to

19   reignite, so to speak, his music career.

20           Prior to being arrested he had entered into a

21   contract with a major record label to begin producing

22   music.  And it was soon thereafter, within weeks of

23   signing that contract, Judge, that he had been arrested on

24   these charges.

25           He has told me, quite candidly, and I will tell

8

1    this Court, that he was on his way out of his environment,

2    on his way out of this game he has been involved in as a

3    young man. Now that he is growing older he realizes he

4    found a way out.

5         Fortunately, I have spoken with the people who

6    signed those contracts with, and they will be available

7    for him, and he will be to continue his work upon his

8    release.

9         THE COURT: How fortunate, because many people

10   in his position, being sentenced, do not have that

11   opportunity awaiting them.

12        MR. RUSSO: And that being said, Judge, I would

13   ask this Court to consider sentencing him below the

14   guideline range of 100 to 125 months.

15        THE COURT: Anything further from the

16   government?

17        MS. BOECKMANN: Nothing further, your Honor.

18        THE COURT: Does your client wish to say

19   anything?

20        (Mr. Russo confers with the defendant.)

21        MR. RUSSO: Yes, Judge, he would like to make a

22   brief statement.

23        THE COURT: Go ahead, sir.

24        THE DEFENDANT: First and foremost, I would like

25   to apologize to the Court for this incident. I would like

9

1    to apologize to my family.

2                THE COURT:  More important.

3                THE DEFENDANT:  More important.

4            To myself and get to move on with my life.

5                THE COURT:  I'm sorry, what?

6                MR. RUSSO:  He is ready to move on with his

7    life, Judge.

8                THE COURT:  And I'm happy to hear that you will

9    have an opportunity awaiting you, and that you are making

10   the most of what you can with the time that you are

11   spending incarcerated.

12               Based upon everything that has gone on here this

13   morning, as you know, Mr. Parker, I'm not bound by the

14   guidelines, but I must consider them.

15               I am considering this range of 100 to 125 months

16   based upon the level of 27 and a prior offense level

17   category of -- a criminal category of four.

18               But I also consider the factors listed in the

19   statute, which include deterrence, not only for you,

20   because obviously you are going to be incarcerated, but

21   after you get out; and also for the community, sending a

22   message as to the penalties that are imposed when people

23   break the law in certain ways by committing certain

24   crimes, as well as the factor of rehabilitation and

25   contrition, which you have clearly shown this morning.

10

1    I tell you now that I have no objection if judge

2  Donnino thinks it appropriate and does impose a concurrent

3  sentence.  I have no problem with that.

4    And I appreciate everything that you have said.

5  But, of course, there is punishment involved, too, in a

6  sentence.

7    Based upon all of that I am going to sentence

8  you to the lowest end of the appropriate guidelines, which

9  is 100 months of incarceration.  I know you served a

10  substantial period of that already.

11    I'm also going to say that while I have no

12  control or even sway with the Bureau of Prisons, I would

13  certainly recommend that you be incarcerated as close to

14  the bulk of your family, as counsel put it, as possible,

15  in order that you may maintain familial relationships with

16  them.

17    So, that is the sentence.  You have your right

18  to appeal.  Good luck, sir.

19    MS. BOECKMANN:  Your Honor, is there also going

20  to be a supervised release condition?

21    THE COURT:  Yes.

22    MS. BOECKMANN:  And the fine.

23    THE COURT:  Yes, and there are certain special

24  conditions that apply as well.

25    MS. BOECKMANN:  I believe the maximum supervised

11

1   release term is three years. I don't know what the

2   Department of Probation specifically recommends here.

3       THE COURT:  And there are other special

4   conditions in this sentence because of the prior

5   relationship you had with certain organizations.

6       So, there will be three years of supervised

7   release following your release from prison.  And you shall

8   submit to drug testing and participate in substance abuse

9   treatment with the treatment provider selected by

10   probation, whether it be out patient or residential

11   treatment.  You shall abstain from all illegal substances

12   as well as alcohol, and contribute to the cost of the

13   services, which are rendered through co-payment or full

14   payment, all to be determined by probation based upon your

15   ability, and that is how well your record is, I suppose,

16   to pay, as well as the availability of third party

17   payment.

18       Importantly, you will not be permitted and you

19   shall not associate with any member or associate of the

20   Bloods or any other s   et gang, either in person, by

21   mail, by telephone, by computer, by any means.

22       And this shall include the wearing of any

23   colors, insignia of any type, be it something you put on

24   or that you have put on to your person, that indicates

25   such an affiliation.

12

1          There is also the imposition of a search

2   condition.

3          There is a $100 special assessment.

4          And you shall submit your person, residence,

5   anything over which you have control, to a search if a

6   probation officer has a reasonable belief that contraband

7   or evidence of a violation of the conditions of release

8   may be found.  Any search, of course, has to be done in a

9   reasonable time and in a reasonable manner.

10          Also, based upon the charges, any supervised

11   release term has a special condition -- as a special

12   condition has a prohibition as to the possession of a

13   firearm.

14          That is the sentence.

15          MS. BOECKMANN:  No fine, your Honor, and

16   restitution is inapplicable; is that correct?

17          THE COURT:  But the $100 special assessment has

18   to be paid.

19          MR. RUSSO:  Yes, I will tell the family.

20          MS. BOECKMANN:  Thank you.

21

22

23          (End of proceedings.)

24

25

EXHIBIT F

§ 17501.    Purposes; findings

(a) **Purposes.** The purposes of the Act are--

(1) to break the cycle of criminal recidivism, increase public safety, and help States, local units of government, and Indian Tribes, better address the growing population of criminal offenders who return to their communities and commit new crimes;

(2) to rebuild ties between offenders and their families, while the offenders are incarcerated and after reentry into the community, to promote stable families and communities;

(3) to encourage the development and support of, and to expand the availability of, evidence-based programs that enhance public safety and reduce recidivism, such as substance abuse treatment, alternatives to incarceration, and comprehensive reentry services;

(4) to protect the public and promote law-abiding conduct by providing necessary services to offenders, while the offenders are incarcerated and after reentry into the community, in a manner that does not confer luxuries or privileges upon such offenders;

(5) to assist offenders reentering the community from incarceration to establish a self-sustaining and law-abiding life by providing sufficient transitional services for as short of a period as practicable, not to exceed one year, unless a longer period is specifically determined to be necessary by a medical or other appropriate treatment professional; and

(6) to provide offenders in prisons, jails or juvenile facilities with educational, literacy, vocational, and job placement services to facilitate re-entry into the community.

(b) **Findings.** Congress finds the following:

(1) In 2002, over 7,000,000 people were incarcerated in Federal or State prisons or in local jails. Nearly 650,000 people are released from Federal and State incarceration into communities nationwide each year.

(2) There are over 3,200 jails throughout the United States, the vast majority of which are operated by county governments. Each year, these jails will release more than 10,000,000 people back into the community.

(3) Recent studies indicate that over 2/3 of released State prisoners are expected to be rearrested for a felony or serious misdemeanor within 3 years after release.

(4) According to the Bureau of Justice Statistics, expenditures on corrections alone increased from $9,000,000,000 in 1982, to $59,600,000,000 in 2002. These figures do not include the cost of arrest and prosecution, nor do they take into account the cost to victims.

(5) The Serious and Violent Offender Reentry Initiative (SVORI) provided $139,000,000 in funding for State governments to develop and implement education, job training, mental health treatment, and substance abuse treatment for serious and violent offenders. This Act seeks to build upon the innovative and successful State reentry programs developed under the SVORI, which terminated after fiscal year 2005.

(6) Between 1991 and 1999, the number of children with a parent in a Federal or State

USCS                                                    1

© 2009 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

correctional facility increased by more than 100 percent, from approximately 900,000 to approximately 2,000,000. According to the Bureau of Prisons, there is evidence to suggest that inmates who are connected to their children and families are more likely to avoid negative incidents and have reduced sentences.

(7) Released prisoners cite family support as the most important factor in helping them stay out of prison. Research suggests that families are an often underutilized resource in the reentry process.

(8) Approximately 100,000 juveniles (ages 17 years and under) leave juvenile correctional facilities, State prison, or Federal prison each year. Juveniles released from secure confinement still have their likely prime crime years ahead of them. Juveniles released from secure confinement have a recidivism rate ranging from 55 to 75 percent. The chances that young people will successfully transition into society improve with effective reentry and aftercare programs.

(9) Studies have shown that between 15 percent and 27 percent of prisoners expect to go to homeless shelters upon release from prison.

(10) Fifty-seven percent of Federal and 70 percent of State inmates used drugs regularly before going to prison, and the Bureau of Justice statistics report titled "Trends in State Parole, 1990-2000" estimates the use of drugs or alcohol around the time of the offense that resulted in the incarceration of the inmate at as high as 84 percent.

(11) Family-based treatment programs have proven results for serving the special populations of female offenders and substance abusers with children. An evaluation by the Substance Abuse and Mental Health Services Administration of family-based treatment for substance-abusing mothers and children found that 6 months after such treatment, 60 percent of the mothers remained alcohol and drug free, and drug-related offenses declined from 28 percent to 7 percent. Additionally, a 2003 evaluation of residential family-based treatment programs revealed that 60 percent of mothers remained clean and sober 6 months after treatment, criminal arrests declined by 43 percent, and 88 percent of the children treated in the program with their mothers remained stabilized.

(12) A Bureau of Justice Statistics analysis indicated that only 33 percent of Federal inmates and 36 percent of State inmates had participated in residential in-patient treatment programs for alcohol and drug abuse 12 months before their release. Further, over one-third of all jail inmates have some physical or mental disability and 25 percent of jail inmates have been treated at some time for a mental or emotional problem.

(13) State Substance Abuse Agency Directors, also known as Single State Authorities, manage the publicly funded substance abuse prevention and treatment system of the Nation. Single State Authorities are responsible for planning and implementing statewide systems of care that provide clinically appropriate substance abuse services. Given the high rate of substance use disorders among offenders reentering our communities, successful reentry programs require close interaction and collaboration with each Single State Authority as the

© 2009 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

program is planned, implemented, and evaluated.

(14) According to the National Institute of Literacy, 70 percent of all prisoners function at the lowest literacy levels.

(15) Less than 32 percent of State prison inmates have a high school diploma or a higher level of education, compared to 82 percent of the general population.

(16) Approximately 38 percent of inmates who completed 11 years or less of school were not working before entry into prison.

(17) The percentage of State prisoners participating in educational programs decreased by more than 8 percent between 1991 and 1997, despite growing evidence of how educational programming while incarcerated reduces recidivism.

(18) The National Institute of Justice has found that 1 year after release, up to 60 percent of former inmates are not employed.

(19) Transitional jobs programs have proven to help people with criminal records to successfully return to the workplace and to the community, and therefore can reduce recidivism.

(April 9, 2008, P. L. 110-199, § 3, 122 Stat. 658.)

© 2009 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

April 20, 2010

TO: Clerk of Courts

FROM: Elmer Parker #

Reference; filing of motion pursuant to $2241

Be adviced that I have requested the B.O.P

take $5.00 out of my account and mail to this clerks

office for it's filing fee's, also I have served a

Copy with proof of service, to, Dept. of Justice,

228 walnut St. Suite # 220, Harrisburg, Pa, 17108, Please notify

me when this has been filed,

Thank you

Elmer Parker # 68949-053
F.C.I. Schuylkill
P.O. Box 759
Minersville, Pa, 12954

Date: 04/14/2010
Time: 11:33:10 am

Location: SCH

# UNITED STATES DEPARTMENT OF JUSTICE
## FEDERAL BUREAU OF PRISONS

Request for Withdrawal of Inmate's Personal Funds

| Encumbrance No.: **2727** |
| --- |

Please charge to my account the sum of **$5.00** and authorize the same to be paid to :

**Contact/FMIS Certification Address**
**Of Courts, Clerk**
**235 N. WASHINGTON ST.**
**Scranton**
**Pennsylvania 18501**
**United States**

Purpose: **Court Fees**
Check Memo:

_____
**(Signature of Inmate)**

**68949053 - PARKER, ELMER**
_____
**(Inmate Register No./Name)**


_____
**(Signature of Approving Official)**


_____                    _____
**(Signature of Deposit Fund Tech)**                    **(Payment #)**


**The inmate's personal account has been charged in the amount indicated above.**

BP - 199.045 - Jan 2008



⟨⟩68949-053⟨⟩
Clerk Of Courts
235 N. Washington ST.
Scranton, PA - 18501
United States

F.C.I. Schuylkill
P.O Box 759
Minersville, Pa, 17954

RECEIVED
SCRANTON
APR

PER _____ DEP. CLERK